**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

JOHN V. HOLTEN,                          :
    Plaintiff,                        :
                                         :
vs.                                      :   Civil NO. 3:10CV00452(AVC)
                                         :
STANDARD PARKING CORPORATION,            :
    Defendant,                        :

**RULING ON THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT**

This is an action seeking compensatory damages and equitable relief.  It arises out of an alleged breach of an employment agreement between the plaintiff John V. Holten, and the defendant, Standard Parking Corporation ("Standard Parking").

The complaint is brought pursuant to common law tenets concerning contract law.  Jurisdiction is authorized pursuant to 28 U.S.C. § 1332[1] on the basis of diversity of citizenship.

On March 7, 2014, Standard Parking filed a partial motion for summary judgment on its third cause of action of the amended counterclaim for breach of fiduciary duty.  On May 6, 2014, Holten filed a motion for summary judgment on Standard Parking's second and third counterclaims.  That same day, Holten also filed a separate motion for summary judgment on his complaint.

---

[1] 28 U.S.C. § 1332 provides, in relevant part: "The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states."

For the following reasons, Standard Parking's motion for summary judgment (document no. 115) and Holten's motion for summary judgment on Standard Parking's second and third counterclaims (document no. 127) are GRANTED IN PART and DENIED IN PART, and Holten's motion for summary judgment on his complaint (document no. 129) is DENIED.

**FACTS**

Examination of the complaint, pleadings, local rule 56 statements, the exhibits accompanying the motion for summary judgment, and the responses thereto, discloses the following, undisputed, material facts:

The defendant, Standard Parking Corporation ("Standard Parking"), is incorporated in Delaware and maintains its principal place of business in Chicago, Illinois.  The company provides professional parking, ground transportation, facility maintenance, security, and event logistics services to real estate owners and managers throughout the country.  From 1989 to 2009, the plaintiff, John V. Holten, beneficially owned a majority interest in Standard Parking and served as chairman of the board of directors.  Holten is a citizen of Norway and a resident of Greenwich, Connecticut.

In April 1989, Holten acquired beneficial ownership of the majority of stock of APOCA, a privately held company that provided parking and management services to garages across the

country.  In 1998, APOCA acquired Standard Parking and adopted its name for the entire corporation.

In April 2004, Holten owned approximately eighty-four percent of Standard Parking's stock.  On May 7, 2004, Holten and James Wilhelm, Standard Parking's President and Chief Executive Officer, executed an employment agreement.  On May 25, 2004, the board of directors at Standard Parking, comprised of Holten, Wilhelm, and Gunnar Klintberg, approved the employment agreement by a unanimous resolution.  Standard Parking did not form a special committee to evaluate this contract.

The contract specified a five-year term of employment and provided an automatic renewal for four-year terms after the initial five-year term expired, unless Standard Parking provided Holten with notice to the contrary at least one year prior to the end of the initial term.  It also stated that any notice not to extend the term of Holten's employment agreement must be "accompanied by a resolution duly adopted by the affirmative vote of not less than three quarters (3/4) of all of the disinterested members of the Board."  Standard Parking agreed to pay Holten "a base salary at an annual rate of not less than Four Hundred Thousand Dollars ($400,000)" in addition to other bonuses, awards, and other forms of compensation.  Specifically, a letter dated May 7, 2004, "memorialize[d] [Holten and Wilhelm's] agreement that the total expense of [Holten's]

3

salary, annual bonus or other bonus, options and equity awards
. . . , deferred compensation, short-term and long-term
compensation, automobile allowance, secretary and office in
Greenwich, Connecticut, and all other benefits and perquisites"
was $650,000 for 2004 and $700,000 for 2005.

On June 2, 2004, Standard Parking went public and closed
its initial public offering ("IPO").  After the IPO, Standard
Parking's board increased to eight members, including four
independent members as defined under NASDAQ rules.  In 2007, a
ninth independent director was appointed.

Since June 2004, Standard Parking has remained a public
company.  In 2005, 2006, 2007, 2008, and 2009, Standard Parking
filed annual proxy statements with the Securities and Exchange
Commission ("SEC") stating that the compensation paid to
Standard Parking's executive officers, including Holten, was
"reasonable and not excessive."  It is disputed, however,
whether the compensation committee or its retained consultant,
Watson Wyatt, ever actually reviewed Holten's compensation.
During that same time period, Holten beneficially owned more
than fifty percent of Standard Parking's capital stock and
voting power through Steamboat Industries LLC, meaning that
Standard Parking constituted a "controlled company" for purposes
of NASDAQ rules.

In 2005, Standard Parking disclosed in a Form 8-K that

Steamboat Industries had pledged 560,000 shares of common stock to an unaffiliated lender.  Standard Parking's audit committee requested outside counsel to prepare a memorandum analyzing "whether or not Mr. Holten, as a director, officer and majority shareholder of SPC, had an obligation to discuss the situation with the Audit Committee in advance of this transaction and the related public disclosure."

On November 2, 2005, three members of Standard Parking's audit committee, who were also independent directors on the board, met with Holten to discuss the memorandum.  The memorandum stated that "[a]s part of a director's duty of care, each board member must disclose to other members of the board information known to the director to be material to the oversight responsibilities of the board or its committees."  It concluded that "Holten should have discussed the refinancing transaction with the Audit Committee in advance of its consummation to give these directors the opportunity to understand the transaction and how the new change of control situation could impact the Company and its risk profile."  The memorandum further advised that Holten should provide the audit committee with the opportunity to conduct a risk assessment before any future refinancing.

In June 2006, GSO Capital Partners loaned Holten, through Steamboat Indsutries, $84 million, which was secured by nearly

all of Holten's Standard Parking stock.  The loan's terms specified a maturity date of September 30, 2008.  Holten disclosed this loan to the independent directors.  In 2007, Holten borrowed an additional $15 million from GSO to purchase a house in Greenwich, Connecticut, which was also secured by the Standard Parking stock.

On May 16, 2008, four of the five independent directors discussed the renewal of the employment agreement between Holten and Standard Parking.  By that time, Holten owed more than $110 million on the GSO loan, which was due in four months.  The four independent directors approved an automatic roll-over of the employment agreement for an additional four-year term.

In September 2008, GSO granted Holten a brief extension of the maturity date of the loan to January 31, 2009.  Holten failed to repay the loan and GSO foreclosed on his shares of Standard Parking.  Accordingly, Holten lost nearly all of his stock in Standard Parking.  On October 5, 2009, Standard Parking removed Holten as chairman and terminated his employment agreement.  On October 7, 2009, Standard Parking filed a Form 8-K with the SEC stating that the terms of Holten's employment agreement were not fair to the company and that the employment agreement resulted from an unfair process.

**STANDARD**

A motion for summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.'"  Am. Int'l Group, Inc. v. London Am. Int'l Corp., 644 F.2d 348, 351 (2d Cir. 1981) (quoting Heyman v. Commerce and Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975)).

A dispute concerning material fact is genuine "if evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  The court must view all inferences and ambiguities in a light most favorable to the nonmoving party.  See Bryant v. Maffucci, 923 F.2d 979, 982 (2d

Cir. 1991).  "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper."  Id.

A dispute concerning material fact is not created by a mere allegation in the pleadings, or by surmise or conjecture. Stuart & Sons, L.P. v. Curtis Pub. Co., Inc., 456 F. Supp.2d 336, 342 (D. Conn. 2006) (citing Applegate v. Top Assoc., Inc., 425 F.2d 92, 96 (2d Cir. 1970); Quinn v. Syracuse Model Neighborhood Corp., 613 F.2d 438, 445 (2d Cir. 1980)). "Conclusory assertions also do not create a genuine factual issue." Id. (citing Delaware & Hudson Ry. Co. v. Conrail, 902 F.2d 174, 178 (2d Cir. 1990).

### DISCUSSION

The complaint alleges that Standard Parking breached its contractual obligations to Holten by terminating him without cause and failing to provide him with the compensation and benefits listed in the severance section of his employment agreement.  The complaint seeks "[c]ompensatory damages, including anticipatory damages arising from defendant's breach of its future obligations under Mr. Holten's Employment Agreement or, with respect to the Company's future contractual obligations, entry of an order requiring defendant to comply with such future obligations."

In its answer, Standard Parking asserts twelve affirmative defenses.  One of the defenses, in particular, is relevant to

the three pending motions for summary judgment.  It argues that "Holten's Employment Agreement is void and, if not void, voidable under Section 144(a) of the Delaware General Corporation Law because the agreement was not approved by informed, disinterested directors or stockholders, was the product of unfair dealing by Holten and is unfair to [Standard Parking]."  In response to the complaint, Standard Parking also filed a counterclaim alleging that Holten breached his fiduciary duties to the company.

## I.  Standard Parking's Second Counterclaim

On May 6, 2014, Holten filed a motion for summary judgment on Standard Parking's second counterclaim.[2]  In the second cause of action of Standard Parking's amended counterclaim, the company alleges that Holten breached his fiduciary duties to the company by "threatening that he would not allow [Standard Parking] to proceed with the IPO unless the Company agreed to his Employment agreement" and executing the agreement without a survey to determine reasonable compensation or a special committee of disinterested directors to review the terms.

In a reply memorandum, Holten argues——quite remarkably for the first time in the history of this case——that equitable

_____

[2] Holten also moved for summary judgment on Standard Parking's third counterclaim.  For purposes of clarity, the court will discuss these arguments below, in the section addressing Holten's motion for summary judgment on his complaint.

tolling is unavailable as a matter of law, as section 52-577 is a statute of repose.  Standard Parking responds that Connecticut and Delaware substantive law treat breaches of fiduciary duties as equitable claims, and thus, it is not subject to a statute of limitations.[3]

### A. § 52-577

On December 20, 2012, this court held in its ruling on Holten's motion to dismiss that "the second count of the amended counterclaim is governed by the three year statute of limitations contained in Conn. Gen. Stat. § 52-577."  Although this is not a motion for reconsideration, Standard Parking takes issue with that conclusion.[4]

Standard Parking's argument relies on the premise that the second counterclaim is equitable in nature, and thus, the limitations period does not apply.[5]  Standard Parking contends that the court improperly cited to In re Colonial Ltd. Partnership Litigation, 854 F. Supp. 64, 90 (D. Conn. 1994),

---

[3] On November 20, 2014, the court granted Standard Parking's motion for leave to file a sur-reply memorandum to address this new argument.

[4] In particular, Standard Parking argues that "Section 52-577 does not set forth the statute of limitations applicable to [Standard Parking's] Second Counterclaim."

[5] Standard Parking first maintains that Delaware substantive law applies, and under Delaware law, a claim for breach of fiduciary duty is an equitable claim.  This argument does not change the court's choice of law analysis from the ruling on the motion to dismiss dated December 20, 2012.  Therefore, the court will continue to look to Connecticut law to determine whether § 52-577 bars this claim.

"without any substantive discussion," for the proposition that "all fiduciary duty breach claims are tort claims and governed by the limitations period set forth in section 52-577." Standard Parking maintains that "if a Connecticut court analyzed the nature of, and relief sought under, [Standard Parking's] Second Counterclaim, it would properly decline to apply Section 52-577 to the claim."  The claim is equitable in nature, according to Standard Parking, because it seeks to void Holten's employment agreement.  Standard Parking further argues that the remedy sought, namely the "disgorgement of the amounts Holten caused the Company to pay him," is based in equity.

There is no dispute that the second counterclaim is captioned "Breach of Fiduciary Duty."  As a preliminary matter, the court notes that Standard Parking's argument directly contradicts a prior memorandum it filed with this court.  On April 5, 2012, Standard Parking asserted in its memorandum in opposition to Holten's motion to dismiss that "under Connecticut law, this breach of fiduciary claim would be subject to a three-year statute of limitations."  Moreover, Standard Parking's argument belies the relief requested in the counterclaim.  The counterclaim prays for "compensatory damages resulting from the costs incurred as a result of Holten's *breaches* of fiduciary duty" and for "punitive damages for Holten's *numerous breaches*

of fiduciary duty."[6]

Connecticut case law overwhelming supports the proposition that a breach of fiduciary duty claim is a tort and, thus, legal in nature.  See, e.g., Northeast Sav. F.A. v. Plymouth Commons Realty Corp., 229 Conn. 634, 642 (1994) (noting that a claim for "breach of fiduciary duty . . . is indisputably legal in nature"); Ahern v. Kappalumakkel, 97 Conn. App. 189, 192 n.3 (2006) (recognizing that "[b]reach of fiduciary duty is a tort action governed by the three year statute of limitations contained within General Statutes § 52-577").  Courts have held, however, that "even when claims are labeled as torts, the claims may essentially sound in equity."  Taylor v. Barberino, No. HHDCV075010769, 2013 WL 656879, at *2 (Conn. Super. Ct. Jan. 24, 2014); see U.S. Trust Co. v. Bohart, 197 Conn. 34, 46 (1985) (holding that "although the counterclaim contains a claim of damages for negligence, its overall tenor is equitable").  Even if the court assumes that the second counterclaim sounds in equity, the court maintains that it is governed by § 52-577.

The Connecticut appellate court has held that "[w]here a party seeks equitable relief pursuant to a cause of action that would also allow that party to seek legal relief, concurrent legal and equitable jurisdiction exists, and the statute of

---

[6] Notably, the complaint does *not* seek these damages resulting only from the alleged breach of fiduciary duty in 2008.  Instead, it seeks legal relief from multiple breaches.

limitations that would be applicable to bar the legal claim also
applies to bar the equitable claim." Gager v. Sanger, 95 Conn.
App. 632, 641-42 (2006) (quoting Dowling v. Finley Assocs.,
Inc., 49 Conn. App. 330, 335 (1998), rev'd on other grounds, 248
Conn. 364 (1999)).[7]  In Certain Underwriters at Lloyd's, London
v. Cooperman, 289 Conn. 383, 407 (2008), the Connecticut supreme
court all but adopted the appellate court's holding.  In
outlining the trial court's reasoning, the supreme court quoted
the appellate court's language from Dowling.  Id. at 407.  The
court ultimately concluded that "the trial court properly
determined that, because the[] legal claims are barred, the
plaintiffs' equitable claims based on the same facts also are
time barred."  Id. at 411.[8]

As some courts have recognized, the appellate court's
holding "does nothing more than state the *long-standing rule*

---

[7] At least one Connecticut superior court decision has characterized the
appellate court's pronouncement of the law as being in "direct contradiction
to the Supreme Court's discussion of the limitations periods for equitable
proceedings in Dunham v. Dunham."  Fishbein v. Ressler, No. NNHCV136042520S,
2015 WL 897551, at *6 n.7 (Conn. Super. Ct. Feb. 11, 2015).  One federal
district court in Connecticut has also noted that the Connecticut appellate
court's decision may be inconsistent with Connecticut supreme court
precedent.  Cendant Corp. v. Shelton, 474 F. Supp. 2d 377, 384 (D. Conn.
2007).  In Dunham, the Connecticut supreme court held that "in an equitable
proceeding, a court may provide a remedy even though the governing statute of
limitations has expired."  204 Conn. at 326.  The supreme court further
provided that "courts in equitable proceedings . . . are by no means obliged
to adhere to those time limitations."  Id. at 326-27.

[8] The court notes that the supreme court did not expressly adopt the appellate
court's holding as its own, as some Connecticut trial courts have stated.
See, e.g., Goldblatt, Marquette & Rashba, P.C. v. Ford, No. CV096005583, 2012
WL 3064625, at *8 (Conn. Super. Ct. June 25, 2012).  The supreme court only
quoted the language in its discussion of the trial court's judgment.

that where a party seeks equitable relief in a cause of action that would also allow for legal relief the statute of limitation for that cause of action nonetheless applies." Williams v. Williams, No. CV065000985S, 2010 WL 4075277, at *5 (Conn. Super. Ct. Sept. 15, 2010); see, e.g., Maurer & Sheperd Joyners, Inc. v. Doherty, No. CV010806832, 2002 WL 1331882, at *2 (Conn. Super. Ct. May 13, 2002). The supreme court's decision in Arrigoni v. Adorno, 129 Conn. 673 (1943), is instructive, particularly with respect to the instant matter. In that case, a director and officer of a corporation "had been intrusted with the matter of finding a suitable party to lease three theatres which were being operated by the corporation under leases it held." Arrigoni v. Adorno, 129 Conn. 673, 675 (1943). The trial court concluded that the director breached his fiduciary duties to the corporation by not disclosing a large personal interest in the theaters under the lease, "but that any claim to recover for that breach of duty was barred by the Statute of Limitations." Id. The supreme court of errors of Connecticut affirmed the trial court's decision and held that "even though this cause of action be regarded as one in equity, equity here should follow the law." Id. at 681. Therefore, the court concluded that "the plaintiffs were barred of their remedy because the period fixed in the Statute of Limitations had passed." Id.

14

Here, under the Connecticut appellate court's formulation of the law, § 52-577 applies to the second counterclaim.  Breach of fiduciary duty is not strictly an equitable action with only an equitable remedy, and thus Standard Parking has the availability of both legal and equitable remedies.  The counterclaim's prayer for compensatory and punitive damages highlights the availability of such legal remedies.  While the second counterclaim may seek equitable relief in part, the claim for breach of fiduciary duty allows Standard Parking to seek legal relief as well.  Therefore, the court concludes that § 52-577 applies to the second counterclaim.

Section 52-577 provides that "[n]o action founded upon a tort shall be brought but within three years from the date of the act or omission complained of."  Conn. Gen. Stat. § 52-577. "The relevant date of the act or omission complained of, as that phrase is used in § 52-577, is the date when the negligent conduct of the defendant occurs and not the date when the plaintiffs first sustain damage."  Piteo v. Gottier, 112 Conn. App. 441, 445-46 (2009) (quoting Farnsworth v. O'Doherty, 85 Conn. App. 145, 149-50 (2004)).  This statute is, therefore, an occurrence statute, "meaning that the time period within which a plaintiff must commence an action begins to run at the moment the act or omission complained of occurs."  Id. at 445 (quoting Labow v. Rubin, 95 Conn. App. 454, 468 (2006)).

"When conducting an analysis under § 52-577, the only facts material to the trial court's decision . . . are the date of the wrongful conduct alleged in the complaint and the date the action was filed." <u>Piteo v. Gottier</u>, 112 Conn. App. 441, 445-46 (2009) (quoting <u>Farnsworth v. O'Doherty</u>, 85 Conn. App. 145, 149-50 (2004)).  It follows, then, that "[i]gnorance . . . on the part of the person against whom the statute has begun to run, will not suspend its operation." <u>Id.</u> at 446 (quoting <u>Bank of Hartford Cnty. v. Waterman</u>, 26 Conn. 324, 330 (1857)).

In this case, the court has already reasoned that "[t]he three-year limitations period provided by Conn. Gen. Stat. §52-577 began to run, at the latest, by June 2, 2004."  Therefore, the court found that the limitations period "expired, at the latest, by June 2, 2007."  Because Standard Parking filed this counterclaim on May 20, 2010, it is barred by § 52-577.[9]

---

[9] Even if the appellate court's holding above is found to be inconsistent with supreme court precedent, the court's conclusion, here, remains undisturbed. The counterclaim seeks relief in the form of compensatory and punitive damages arising from the *breaches* of fiduciary duty.  This prayer for relief indicates to the court that these damages arise from the alleged breach of fiduciary duty that occurred when Holten and Standard Parking executed the employment agreement in 2004 and when Holten failed to disclose the material facts of the loan prior to the automatic renewal of the employment agreement in 2008.  Since § 52-577 applies to the legal relief sought in connection with the alleged breach of fiduciary duty in 2004, it follows that the statute applies to the equitable relief as well.  Put differently, because Standard Parking is barred from recovering compensatory or punitive damages on this second counterclaim, its equitable claims based on the same facts are also time barred.  <u>See</u> <u>Certain Underwriters at Lloyd's, London v. Cooperman</u>, 289 Conn. 383, 411 (2008); <u>see also</u> <u>Campbell v. New Milford Bd. of Educ.</u>, 423 A.2d 900, 905 n.5 (Conn. Super. Ct. 1980) ("[I]n a suit to enforce a right which seeks both legal and equitable relief, equity will withhold its remedy if the legal right is barred by the relevant statute of limitations.").

### B. Adverse Domination or Equitable Tolling

Standard Parking next argues that § 52-577 should be tolled due to Holten's control and domination of Standard Parking and its board.  It also argues that principles of equitable tolling should bar dismissal of this claim.  Specifically, Standard Parking contends that the "extraordinary circumstance" of Holten's controlling stake in the company prevented it from pursuing its rights and that the company diligently pursued the claim as soon as Holten lost control.  Holten responds that no Connecticut court has ever applied the doctrine of "adverse domination" to toll a statute of limitations.  Holten further contends that since § 52-577 is a statute of repose, no form of equitable tolling applies.

The second circuit has stated expressly that "the possibility that equitable tolling might apply . . . is foreclosed by Connecticut precedent, which establishes Conn. Gen. Stat. § 52-577 as a statute of repose not susceptible to equitable tolling."  Gerena v. Korb, 617 F.3d 197, 206 (2d Cir. 2010).  The parties also agree that a Connecticut court has never applied the doctrine of adverse domination, which is a form of equitable tolling, to toll a statute of limitations.  Therefore, the court concludes that equitable tolling and adverse domination are inapplicable to extend the time period contained in § 52-577.

Accordingly, Holten's motion for summary judgment on Standard Parking's second counterclaim is granted.

## II.   **Holten's Motion for Summary Judgment on His Complaint**

On May 6, 2014, Holten filed a motion for summary judgment on his complaint.  Holten claims he is entitled to severance compensation through June 2, 2015 after Standard Parking terminated him without cause. He seeks a total loss of $5,462,009, which includes his annual base salary, medical insurance coverage, an automobile expense benefit, reimbursement for office rental and secretarial assistance, and prejudgment interest.  He contends that Standard Parking's defenses are meritless as a matter of law and undisputed fact.

### A. Entire Fairness of the Employment Agreement in 2004

Holten first argues that the employment agreement "was adopted prior to [Standard Parking's] IPO in circumstances that were entirely fair to Standard . . . ."  Holten outlines a number of steps used to demonstrate "arm's length bargaining" and notes three "concessions" he allegedly made, including cancelling a previous agreement, assuming debt to retire Standard Parking's preferred stock obligations, and locking up his stock for two years after the IPO.

Standard Parking responds that the terms of the contract, including the compensation and benefits, the severance package, and the termination provisions, were not fair to the company.

18

It further contends that the timing of the agreement and the inability for the directors to reject or negotiate the terms of the agreement demonstrate that the employment agreement was the product of an unfair process.[10]

"[A] shareholder owes a fiduciary duty only if it owns a majority interest in or exercises control over the business affairs of the corporation." Kahn v. Lynch Commc'n Sys., Inc., 638 A.2d 1110, 1113 (Del. 1994) (quoting Ivanhoe Partners v. Newmont Mining Corp., 535 A.2d 1334, 1344 (Del. 1987)). "The duty a controlling shareholder owes when it stands on both sides of the transaction——i.e., where the controlling shareholder has a personal interest, as well as an interest as a fiduciary for the corporation——is to ensure that the transaction is entirely fair." In re Cornerstone Therapeutics Inc. Stockholder Litig., No. 8922-VCG, 2014 WL 4418169 (Del. Ch. Sept. 10, 2014) (citing Sterling v. Mayflower Hotel Corp., 93 A.2d 107, 109-10 (Del. 1952)); see also Ams. Mining Corp. v. Theriault, 51 A.3d 1213, 1239 (Del. 2012); Kahn v. Tremont Corp., 694 A.2d 422, 429 (Del. 1997); Kahn v. Lynch Commc'n Sys., Inc., 638 A.2d 1110, 1115 (Del. 1994). Entire fairness is the necessary standard for

---

[10] Specifically, Standard Parking represents that "(i) the Contract was presented to the Company on the eve of its IPO, (ii) [Holten] threatened to veto the IPO if the Company did not sign the Contract, (iii) the vast majority of the revisions to the Contract were administrative, ministerial, and/or non-substantive, and (iv) it was executed 4 days after it was first presented to the Company."

cases involving controlling shareholders because "the controlling shareholder will continue to dominate the company regardless of the outcome of the transaction." Kahn v. Tremont Corp., 694 A.2d 422, 428 (Del. 1997).  Even if a committee of independent directors is used to approve the transaction, "the underlying factors which raise the specter of impropriety can never be completely eradicated." Id.  Controlling shareholders must "demonstrate their utmost good faith and the most scrupulous inherent fairness of the bargain." Weinberger v. UOP, Inc., 457 A.2d 701, 710 (Del. 1983).

Entire fairness concerns two concepts examined together as a whole: 1) fair dealing; and 2) fair price.  Id. at 711.  Fair dealing "embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained." Id.  Fair price "relates to the economic and financial considerations of the [transaction]." Id.

Courts have characterized the entire fairness standard as Delaware's most onerous standard of review.  See, e.g., In re Orchard Enters., Inc. Stockholder Litig., 88 A.3d 1, 34 (Del. Ch. 2014); Quadrant Structured Prods. Co., Ltd. v. Vertin, 102 A.3d 155, 183 (Del. Ch. 2014); In re Trados Inc. Shareholder Litig., 73 A.3d 17, 44 (Del. Ch. 2013); Reis v. Hazelett Strip-

Casting Corp., 28 A.3d 442, 459 (Del. Ch. 2011).  In general, the entire fairness standard is a fact-intensive inquiry that may be difficult to resolve at the summary judgment phase of litigation.  See Godina v. Resinal Int'l, Inc., 677 F. Supp. 2d 560, 572 (D. Conn. 2009) (noting in a ruling on a motion for summary judgment that "the issue of entire fairness is best left to the trier of fact"); see also Encite LLC v. Soni, No. 2476-VCG, 2011 WL 5920896, at *20 (Del. Ch. Nov. 28, 2011); Orman v. Cullman, 794 A.2d 5, 21 n.36 (Del. Ch. 2002).

As an initial matter, Holten owned a majority interest in the corporation at all times relevant to the execution of the employment agreement.  Thus, Holten owed a fiduciary duty to Standard Parking as a controlling shareholder.  See Kahn v. Lynch Commc'n Sys., Inc., 638 A.2d 1110, 1113 (Del. 1994).

In 2004——when the parties initially executed the employment agreement——Holten stood on one side of the transaction in his personal capacity and on the other side as the owner of a majority interest in the corporation.  Therefore, the entire fairness standard applies to this transaction.  At this stage of the case, issues of material fact remain as to the fairness of the compensation package and the process by which the parties negotiated the employment agreement in 2004.  Holten outlines steps taken to assure that the parties negotiated at arms-length and that he did not dictate the terms of the employment

agreement, but there are issues of material fact concerning the timeline of the transaction in relation to the planned IPO and the substance of the negotiations. These alleged circumstances call into question the degree to which the negotiations were truly at "arms-length." There is also an issue of material fact as to whether each party had, in fact, exerted bargaining power against the other at arm's length, as required by the Delaware supreme court. See Weinberger v. UOP, Inc., 457 A.2d 701, 709 n.7 (Del. 1983). Finally, except for general arguments stating that the compensation arrangement was fair, Holten does not offer evidence in response to Standard Parking's contention that his compensation package was unreasonable and excessive.

### B. Ratification

Holten next contends that Standard Parking ratified the employment agreement by disclosing the contract in its public filings with the SEC and describing the agreement in detail in annual proxy statements. In addition to proxy statements submitted from 2004 through 2008, Holten argues that Standard Parking confirmed the renewal of the employment agreement after GSO foreclosed on his shares of Standard Parking in a July 2009 proxy statement.[11] Holten asserts that Standard Parking's

---

[11] Specifically, Holten argues that Standard Parking's SEC filings "expressly confirmed [Standard Parking's] obligations under Mr. Holten's Employment Agreement, the renewal of the Agreement through May 2015, the fairness of Mr. Holten's compensation, and the company's severance obligations to Mr. Holten in the event he was terminated without cause."

statements in its SEC filings are binding on the company, and the company "cannot now avoid its admissions with respect to its obligations . . . by simply stating that its SEC filings were 'incorrect.'"  Standard Parking responds that the SEC filings do not demonstrate ratification because "Holten controlled [Standard Parking] at the time of such filings, and the referenced statements did not concern Holten's Contract."

There are issues of material fact as to whether the characterization of the contracts in the proxy statements as "reasonable and not excessive" involved Holten's employment agreement and whether the SEC proxy statements ratified the agreement in light of the corrected filings Standard Parking made after Holten's termination.  The court further concludes that Standard Parking is not barred from contradicting any statements made in regulatory filings prior to the termination of Holten's employment.[12]  At this time, the court rejects Holten's argument that Standard Parking ratified the employment

---

[12] Holten relies on the second circuit's ruling in AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A., 626 F.3d 699 (2d Cir. 2010), for the proposition that Standard Parking cannot now take a position contrary to their SEC filings.  In that case, the court concluded that "two recently created regulatory filings, not submitted by the plaintiffs to the district court until after summary judgment motions were filed . . . [were] insufficient to create a genuine issue of material fact," especially because the plaintiffs were unable to make such assertions contrary to their previous representations.  Id. at 736.  This holding is distinguishable for two reasons.  First, on October 9, 2009, prior to the initiation of this lawsuit, Standard Parking filed a form 8-K with the SEC stating that "the terms of the Agreement [were] not fair to the Company and were not fair to the Company at the time it was executed."  Thus, Standard Parking did not "create" this issue simply to defeat summary judgment.  Second, there is no indication in the case that the relevant statement made in the regulatory filings involved a "controlling shareholder."

agreement.

Holten also relies upon the deposition testimony of one director, Charles Biggs, to argue that Standard Parking's board of directors unanimously ratified the employment in 2005, 2006, 2007, and 2008.  Standard Parking responds that the meeting minutes from all of the board's meetings between 2004 and 2008 fail to indicate that the board ratified the contract.  The court concludes that an issue of material fact exists regarding whether the full board of directors actually ratified the employment agreement.

Holten next argues that Standard Parking ratified the employment agreement "when the independent directors determined that the Agreement should be allowed to renew for an additional four year term," as documented in the meeting minutes.  Standard Parking responds that the May 2008 meeting between the five independent directors "could not have resulted in a ratification as a matter of fact or law," as the board of directors never voted on the employment agreement as required by the bylaws.[13] Standard Parking states that Holten concealed material facts relating to his loan, and thus, any decision to allow the contract to renew could not be a valid ratification.

There is an issue of material fact as to whether the May

---

[13] Standard Parking also argues that the five directors who reviewed the renewal did not constitute a committee designated by the board.

2008 meeting complied with Standard Parking's bylaws for purposes of ratifying the employment agreement.  Moreover, there is an issue of material fact as to whether Holten concealed material facts relating to his loan and, therefore, whether a valid ratification could have even occurred.[14]

### C. Renewal of the Employment Agreement in 2008

Holten next argues that his alleged non-disclosures did not affect Standard Parking's decision to renew his agreement nor did Holten believe that he would default on the GSO loan.[15] Holten argues that "disclosure of the details of the GSO debt would not have caused [three disinterested directors] to vote to terminate Holten's Employment Agreement."  Holten contends that at least six of the eight directors needed to vote against the automatic renewal of the employment agreement and that three of the directors have stated that they would not have voted against automatic renewal at that time even if Holten disclosed the material facts of the loan.  Therefore, Holten argues that Standard Parking cannot show that the contract would not have been renewed even if he did disclose the material terms of the loan.  Standard Parking responds that Holten cannot rely upon a provision within the same employment agreement that Standard

---

[14] The court will discuss Holten's alleged failure to disclose the material facts of his loan below.

[15] Holten makes this same argument in his motion for summary judgment on Standard Parking's third counterclaim, and he incorporates the same arguments into the motion for summary judgment on his complaint.

Parking has argued is void or voidable.

The provision at issue states that notice of Standard Parking's intent not to extend Holten's term of employment must be "accompanied by a resolution duly adopted by the affirmative vote of not less than three quarters (3/4) of all of the disinterested members of the Board."  It remains disputed, however, whether the employment agreement meets the entire fairness standard, and, therefore, it would be improper for the court to give effect to this provision at this time.  Indeed, if the trier of fact finds that Holten breached his fiduciary duty in failing to ensure that the initial employment agreement was entirely fair, it may be entirely irrelevant whether any of the disinterested directors would have voted against automatic renewal.

Holten next argues that "Standard has no evidence that [he] knew or even thought it was likely that he would be unable to refinance or restructure the debt or believed during the first half of 2008 that a default on the debt was likely."  Holten contends that he actively negotiated with GSO to restructure the debt prior to defaulting on the loan, and "the fact that [he] was ultimately unable to consummate a deal when the financial market collapsed . . . does not . . . convert mistaken confidence into a knowing non-disclosure of an imminent default."  Standard Parking responds that "[a]ny . . . hope

26

Holten claims to have harbored about extricating himself from his existing loan obligations simply could not excuse his failure to disclose in May 2008 the material terms of his loan."

The court concludes that it is immaterial whether Holten believed he could have restructured his loan at the time of the renewal of the employment agreement.  As the court will conclude in the following section, Holten had a fiduciary duty, as a controlling shareholder on both sides of the transaction, to ensure that the employment agreement was entirely fair.  A good faith belief that he could restructure the terms of the GSO loan does not excuse Holten from ensuring that the transaction was entirely fair to the company.

### D. Equitable Defenses

Finally, Holten contends that Standard Parking is "now barred by the equitable doctrines of acquiescence, equitable estoppel, waiver and laches from asserting the voidability of the Agreement."  Standard Parking responds that "Holten's arguments pertaining to these four equitable defenses fail on summary judgment because they relate to questions of fact reserved for the exclusive province of the trier of fact."

The court agrees with Standard Parking.  The same issues of material fact discussed above preclude the court from applying these equitable defenses.

Taken together, the court holds that Holten's motion for

summary judgment on his complaint and his motion for summary judgment on Standard Parking's third counterclaim are denied.

### III.   Standard Parking's Third Counterclaim

The third cause of action of Standard Parking's amended counterclaim alleges that Holten breached his fiduciary duty to the company by concealing information about his loan prior to the board's reconsideration of the renewal of his employment agreement.  Standard Parking seeks all money paid to him during the renewal period, a repayment of the costs associated with a secondary public offering following the foreclosure on his shares, and exemplary damages.

On March 7, 2014, Standard Parking filed a motion for partial summary judgment, contending that Holten owed a duty to disclose the terms of the GSO loan, including the amount and the maturity date, to Standard Parking, and Holten breached that duty.  Holten responds that he did not have a "general, affirmative duty to disclose the details of his personal financial dealings," as Standard Parking was not a "related party" to the loan and, therefore, "Holten had a right to personal privacy in those financial transactions."  In pledging the stock, Holten argues that his "sole fiduciary obligation in connection with any loan transaction involving pledged shares of Standard stock was to notify the company of the fact of the transaction" so the company could give public notice of the

28

pledge and risk of change of control through an SEC filing.[16]

As discussed earlier, the entire fairness standard applies where a controlling shareholder stands on both side of a transaction.  This standard examines fair dealing and fair price together as whole.  In addition to the definitions of these terms stated above, fair dealing includes the duty of disclosure, see Weinberger v. UOP, Inc., 457 A.2d 701, 710 (Del. 1983),[17] which requires a controlling shareholder who stands on both sides of a transaction to "disclose fully all the material facts and circumstances surrounding the transaction,"  Kahn v. Lynch Commc'n Sys., Inc., 669 A.2d 79, 88 (Del. 1995); see also Mills Acquisition Co. v. Macmillan, Inc., 559 A.2d 1261, 1280 (Del. 1989) (noting that the concept of fair dealing "embraces the duty of candor owed by corporate fiduciaries to disclose all material information relevant to corporate decisions from which they may derive a personal benefit").  Facts are material "if 'there is a substantial likelihood that a reasonable shareholder

---

[16] This obligation, Holten asserts, arose from the company's Insider Trading Policy, which "required the officer or director to provide Standard with a Pre-Clearance Certificate giving advance notice of any intended pledge." Standard Parking notes that this focus on the insider trading policy "is a red herring and irrelevant to the issue of whether Holten owed and satisfied a duty to fully disclose his Loan terms to [Standard Parking] in connection with his Contract renewal."

[17] In Weinberger v. UOP, Inc., the Delaware supreme court used the term "duty of candor" rather than the "duty of disclosure."  See 457 A.2d 701, 710 (Del. 1983).  The Delaware Supreme Court has since found it to be "more appropriate . . . to speak of a duty of disclosure based on a materiality standard rather than the unhelpful terminology that has crept into Delaware court decisions as a 'duty of candor.'"  Stroud v. Grace, 606 A.2d 75, 84 (Del. 1992).

would consider it important in deciding how to vote . . ." <u>Kahn v. Lynch Commc'n Sys., Inc.</u>, 669 A.2d 79, 88 (Del. 1995) (alteration in original) (quoting <u>Rosenblatt v. Getty Oil Co.</u>, 493 A.2d 929, 944 (Del. 1985)).

Here, Holten had a fiduciary duty as the controlling shareholder of Standard Parking to ensure that the renewal of his employment agreement——a related-party transaction where Holten stood on both sides of the agreement——was entirely fair to the company.  This duty encompassed a responsibility to disclose all material facts concerning the loan prior to the consideration of his contract for an automatic renewal.  The court finds that Holten's argument against disclosure misses the mark, as it focuses upon the fact that the loan itself was not a related-party transaction.  The transaction at issue is not the pledge of stock for the GSO loan.  As Holten observes and Standard Parking admits, that transaction did not involve the company and, thus, it was not a related-party transaction.  Instead, the transaction at issue is the renewal of the employment agreement in May 2008.  Therefore, the issue is whether a duty to disclose the material facts of the loan arose prior to the automatic renewal of the related-party employment agreement.  The court concludes that Holten had a duty as a controlling shareholder to ensure that the renewal of the employment agreement was entirely fair and that duty required

him to disclose fully all the material facts and circumstances surrounding the transaction.

Standard Parking contends that Holten breached this duty by concealing material information about the GSO loan and the risk it posed to his continuing ownership of Standard Parking stock prior to the review of his contract renewal.  Holten responds that he made Steamboat Industries' Chief Financial Officer, A. Petter Ostberg, available to the audit committee to answer questions concerning Holten's financial arrangements with GSO. Moreover, he contends that his office sent an excel spreadsheet detailing the amount of the loan to a number of Standard Parking officers.

The court concludes that issues of material fact remain as to whether the directors knew of the loan's terms prior to the renewal of the employment agreement.  On October 31, 2007, Ostberg reviewed "the existing financing arrangements that Mr. Holten ha[d] with GSO, First Boston and Merrill Lynch" with the audit committee.  There are factual disputes relating to the subject of the conversations at the meeting and the answers that Ostberg gave to the committee's questions.  There is also an issue of material fact with respect to whether the company received notice of the loan in January 2008, through an Excel spreadsheet e-mailed to a number of Standard Parking officers. Although Standard Parking argues that the Excel attachment

31

contained a "hidden spreadsheet," which was "not readily viewable in the electronic version that was sent," it remains unclear whether Standard Parking possessed the terms of the loan prior to the renewal of the employment agreement.

Accordingly, Standard Parking's motion for summary judgment is granted on the limited issue that Holten had a fiduciary duty to ensure that the renewal of the employment agreement was entirely fair to the corporation.  The motion is denied in all other respects, as issues of material fact remain for trial.

### CONCLUSION

For the foregoing reasons, Holten's motion for summary judgment on his complaint (document no. 129) is DENIED, Holten's motion for summary judgment on Standard Parking's second and third counterclaims (document no. 127) is GRANTED IN PART and DENIED IN PART, and Standard Parking's motion for summary judgment on its third counterclaim (document no. 115) is GRANTED IN PART and DENIED IN PART.

It is so ordered this 27th day of March 2015, at Hartford, Connecticut.

_____/s/_____
Alfred V. Covello,
United States District Judge